Michael V. POLELLE, on behalf of himself Individually and on behalf of all others similarly situated, Plaintiff,

v.

SECRETARY OF HEALTH, EDUCATION AND WELFARE OF the UNITED STATES of America, Defendant.

No. 73 C 774.

United States District Court,
N. D. Illinois, E. D.

April 19, 1974.

Michael J. Polelle, Hanover Park, Ill., for plaintiff.

James R. Thompson, U. S. Atty., N. D. Ill., Chicago, Ill., for defendant.

Before CUMMINGS, Circuit Judge, and MAROVITZ and McMILLEN, District Judges.

## MEMORANDUM OPINION AND JUDGMENT ORDER

Plaintiff has asked us to invalidate former Section 215(b)(3) of the Social Security Act (42 U.S.C.A. § 415 (b)(3) (1969)) on the ground that it permits females to receive more favorable retirement insurance benefits than similarly situated males. He exhausted his administrative remedies before filing this action.

According to the complaint, plaintiff was born on February 20, 1908. On October 18, 1971, at age 63, he filed an application for social security retirement benefits. He began to receive benefits in January 1972. According to the defendant's answers to plaintiff's interrogatories, plaintiff was then entitled to a monthly benefit of $195.30, whereas a female with the same birthdate and identical earnings would have been entitled to a monthly benefit of $201.70.[1] As of December 1972, the *average* monthly retirement insurance benefit for males was $179.60 and for females, $140.50.[2]

■ Section 215(a) of the Social Security Act sets out a table for determining the primary old age insurance amount based on an individual's "average monthly wage" as defined in Section 215(b) of the Act. Section 215(b)(3) permitted the use of three fewer years as a basis for calculating a female wage earner's "average monthly wage" than were used in making the same calculation for a male wage earner.[3] The effect of decreasing the number of years used in the computation of a female's average monthly wage is to eliminate years of lower earnings, thus increasing the average monthly wage, and, in turn, the monthly retirement benefit.[4]

■ The Government has filed a motion to dismiss and asserts that the benefit computation formula does not result in an ˙ unconstitutional classification

1. The interrogatory answers also state that as of September 1972, plaintiff's monthly benefits would be $236.30, and the monthly benefits of a female in identical circumstances would be $244. The complaint asserts that plaintiff was entitled to $188.50 monthly and that a female in the same position would be entitled to $258.10, or $69.60 more per month than received by plaintiff. For present purposes, it is immaterial whether the figures in the complaint or in the interrogatory answers are more accurate. In either event, there is a disparity in favor of females. The amount of the disparity is analyzed at note 8 and accompanying text.

It should be emphasized that this case deals with beneficiaries collecting old age assistance based on their own work record. It is thus quite different from Wiesenfeld v. Secretary of HEW, 367 F.Supp. 981 (D.N.J. 3-judge court, 1973), stayed pending appeal, Rosen, "Widower Wins: Benefits for Men," Civil Liberties, March 1974, p. 4, which invalidated discrimination in benefits for surviving spouses based on the deceased spouse's work record.

2. Affidavit of Deputy Director, Bureau of Retirement and Survivors Insurance, submitted in support of Government's reply brief.

3. Section 215(b)(3) provided in pertinent part:

"(3) For purposes of paragraph (2), the number of an individual's elapsed years is the number of calendar years after 1950 (or, if later, the year in which he attained age 21) and before—
(A) in the case of a woman * ˙ * the year in which she attained age 62,
* * *

⁎          ⁎          ⁎          ⁎          ⁎

(C) in the case of a man * * * the year in which he attained age 65." (42 U.S.C.A. § 415(b)(3) (1969)).

4. Section 104(b) of the Social Security Act Amendments of 1972 changed Section 215(b)(3) to provide that the same number of years be used in computing benefits for both sexes. 42 U.S.C.A. § 415(b)(3) (1974 Supp.). However, this provision does not affect plaintiff because it only applies to men who attain age 62 after December 1974. Amendments Section 104(j); 86 Stat. 1341. Plaintiff's argument that making this amendment non-retroactive denies equal protection borders on the frivolous. Sperry and Hutchinson Co. v. Rhodes, 220 U.S. 502, 504; 31 S.Ct. 490, 55 L.Ed. 561.

based on sex.[5] Its position is that the discrimination in favor of females is designed to compensate for the discrimination in wages they suffered during their working years. The following examples are greatly oversimplified, but illustrate the Government's contention. If a female whose yearly earnings averaged $9,500 received, by virtue of Section 215(b)(3), the same benefits as a male who averaged $10,000, it is justified because her wages were probably held down by sex discrimination. A woman who averaged $10,000 in earnings per annum would receive more benefits than a man who averaged $10,000, but she would have presumably averaged more earnings except for discrimination in female wages. Because the average female benefit is less than the average male benefit (text at note 2, *supra*), the Government argues that the past wage discrimination is still not overcome.[6] Since the difference will be phased out by 1975 (note 4, *supra*), Congress has evidently decided that by then women will have worked a sufficient number of years under the Equal Pay Act (29 U.S. C. § 206(d)), Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e–2) and related laws to make further compensation for discrimination unnecessary.

The same constitutional question presented by plaintiff was decided in favor of the Government in Gruenwald v. Gardner, 390 F.2d 591 (2d Cir. 1968), certiorari denied sub nom. Gruenwald v. Cohen, 393 U.S. 982, 89 S.Ct. 456, 21 L. Ed.2d 445. Applying the rationality test, the court upheld Section 215(b)(3) as a means of reducing sexual inequality. We cannot subscribe to the opinion in *Gruenwald*; it relies on cases which are probably no longer good law, and treats women with the "romantic paternalism" condemned by the plurality

opinion in Frontiero v. Richardson, 411 U.S. 677, 684, 93 S.Ct. 1764, 36 L.Ed.2d 583. But we believe that *Gruenwald's* narrow holding is correct. The *Frontiero* plurality cited that holding with apparent approval:

"It should be noted that these statutes are not in any sense designed to rectify the effects of past discrimination against women. See Gruenwald v. Gardner, 390 F.2d 591 (CA2 1968), cert. denied, 393 U.S. 982, [89 S.Ct. 456, 21 L.Ed.2d 445] (1968); cf. Jones v. Alfred H. Mayer Co., 392 U. S. 409, [88 S.Ct. 2186, 20 L.Ed.2d 1189] (1968); South Carolina v. Katzenbach, 383 U.S. 301, [86 S.Ct. 803, 15 L.Ed.2d 769] (1966)." 411 U.S. 689, n. 22, 93 S.Ct. at 1771.

We conclude that Section 215 (b)(3) is a constitutionally permissible means of overcoming past discrimination. It is loosely analogous to statutes and decisions requiring differential treatment of groups to avoid perpetuating the effects of past discrimination. See Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 19–25, 91 S.Ct. 1267, 28 L.Ed.2d 554; Gaston County v. United States, 395 U.S. 285, 296–297, 89 S.Ct. 1720, 23 L.Ed.2d 309; Southern Illinois Builders Assn. v. Ogilvie, 471 F.2d 680 (7th Cir. 1972); Bowe v. Colgate-Palmolive Co., 489 F.2d 896, 900 (7th Cir. 1973); Carter v. Gallagher, 452 F.2d 315, 330–331 (8th Cir. en banc, 1972), certiorari denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338. We do not suggest that Congress is required to compensate for private discrimination. But certainly it is permissible for it to try to do so.

If we apply the strict scrutiny test adopted by the *Frontiero* plurality, the Government has a compelling interest in not itself compounding illegal discrimi-

---

5. To the extent that we consider matters outside the pleadings, the motion is treated as one for summary judgment. F.R.Civ.P. 12(b)(6).

6. Stated in this form, the argument assumes that all differential in male and female earn-

ings is attributable to sex discrimination. We need not make that assumption to decide this case; it is sufficient if sex discrimination causes some substantial amount of the difference.

nation. Yet this would be the effect if it based benefits on average earnings which it knew had been held down by discrimination. We agree with McEvoy v. Weinberger, No. 72–1727–Civ JE (S. D.Fla.1973), where the court held that the method of equalization used by Congress in Section 215(b)(3) was appropriate to achieve a compelling state interest. As the court there observed,

> "The resulting classification is grounded on the difference in earning power caused by past and, to some extent, present discrimination. The goals are legitimate and the classification adopted is reasonably related to achieving the legislative purpose. The reduction of economic disparity between the sexes provides a compelling governmental interest." [7]

We adopt this quotation with only one reservation: we find it unnecessary to decide whether reduction of any economic disparity not caused by discrimination is a compelling governmental interest.

Plaintiff relies heavily on Rosen v. Public Service Electric and Gas Co., 477 F.2d 90 (3d Cir. 1973), but that case did not even involve equal protection as embodied in the due process clause of the Fifth Amendment. Quite rightly, *Rosen* held that a private retirement pension plan favoring females violated Section 703(a)(1) of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–2(a)(1)). In *Rosen,* the defendant did not contend that its plan compensated for previous wage discrimination, and the nature of the plan makes clear that that could not have been its rationale. The other cases cited in plaintiff's brief are equally distinguishable.

The remaining issue is whether the extent to which the formula of Section 215(b)(3) benefits women is reasonably related to the amount of wage discrimination suffered by women. Plaintiff argues that not all women suffered discrimination, and those that did were victimized in differing amounts, so that compensation can be made only after individual determinations of the amount of discrimination suffered by each working woman.

■ We of course adhere to the Supreme Court's holdings that administrative convenience cannot justify sex discrimination. *Frontiero,* 411 U.S. at 690, 93 S.Ct. 677; Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225. But the individual determinations suggested by plaintiff would not be just administratively inconvenient; they would be impossible. They would require a hearing for each woman who applied for social security to determine what her earnings in each year since 1950 would have been had there been no sex discrimination. It is difficult enough, and sometimes impossible, to determine what a woman would have been paid for the job she held applying the rules and policies relevant to male employees of the business in which she worked. See Bowe v. Colgate-Palmolive Co., 489 F.2d 896 (7th Cir. 1973), where it was said, "It is clear to all, as found by the district court, that it would be impossible to reconstruct the employment history of each employee as if no discrimination existed * * *." 489 F.2d 901. To go further, and try to determine what a woman would have made if all occupations had been equally open to her at the rate of pay prevailing for males, is an attempt Congress could choose not to require. To try to make that determination not just for the recent past, but for every year since 1950, including the effects of pre-1950 discrimination on later earnings, for every woman who collects social security based on her own work record, is clearly impossible. Such investigations would be much different from a hearing to determine which of two contenders is more competent to administer an estate, as in *Reed,* or a hearing to determine whether a husband provides more than half his wife's support, as in *Frontiero.*

---

7. In *McEvoy,* a 3-judge court was dissolved and the case was transferred to a single district judge who prepared the opinion granting the Secretary's motion for judgment.

These difficulties of measurement do not mean that women did not suffer massive economic discrimination, or that the solution Congress has enacted is speculative. It is not very far wrong to say that Section 215(b)(3) makes an accurate (or inadequate, which leaves the male plaintiff no grounds for complaint) correction for discrimination for any woman who worked at least three years in a situation in which her pay was artificially low due to discrimination. For in such cases those three years should obviously be excluded from any average.[8]

■ Certainly it is not unreasonable for Congress to act as though all working women suffered employment discrimination for at least three years. Plaintiff's brief admits that at least before 1968, women were "disadvantaged * * * in the marketplace." The years before 1968 are obviously relevant to the average monthly wage on which the retirement benefit for women in plaintiff's age cohort is calculated. Nor did sex discrimination suddenly end in 1968. Census Bureau statistics show that considering only full-time year-round workers over age 25 in 1971, and

controlling for educational attainment, the median income of women in each educational group ranged from 55% to 64% of the median male income.[9] The difference is not eliminated when the statistician considers only the earnings of women who were never married, though their labor force participation is more continuous than married women's.[10] Wage differentials are pervasive in all segments of the economy.[11] Since a woman's earnings would be affected either by unequal pay for equal work, or by unequal access to better paying jobs, Congress could quite reasonably conclude that the number of working women who did not have their earnings affected by discrimination in at least three different years is negligible. Accordingly, we reject plaintiff's contention that Section 215(b)(3) is invalid because it overcompensates victims of discrimination.

Finally, we emphasize that this is a narrow holding, limited to the facts before us. We deal with a government benefit computed on the basis of earnings figures known to be discriminatory. The correction factor is related to the known discrimination as immedi-

---

8. Actually, this is an oversimplification of Section 215(b)(3), for the three additional years dropped may not be the three years in which discrimination was suffered. Consider the workings of the statutory formula for a man and a woman like plaintiff, who was born in 1908 and who first applied for benefits in 1971. If they had been continuously employed in jobs covered by social security, these beneficiaries would have 21 "computation base years" (§ 215(b)(2)(C); § 202(a) [42 U.S.C. § 402(a)]). Under Sections 215(b)(3) and 215(b)(2)(A), the woman would have 15, and the man 18, "benefit computation years." This would mean that the woman could drop her six years of lowest earnings; the man could drop his worst three years. It is possible that in the woman's fourth, fifth and sixth lowest paid years, her earnings were unaffected by discrimination. But if her earnings in the three worst years were affected by discrimination, then those three years should be eliminated, and the fourth, fifth and sixth worst years would become excludable even under the formula for males. Conceptual

difficulties only arise in the presumably unusual situation of a woman who was fairly paid during her six lowest income years, but suffered discrimination in her higher paid years. Such a woman would receive a windfall only if the sum of her pay in her fourth, fifth and sixth lowest years, subtracted from three times her average pay in all the higher years, is greater than the total amount of wages lost due to discrimination in her career. There may be such women, just as there may be women who never suffered employment discrimination at all, but since it is impossible to identify them, their existence does not invalidate the Congressional scheme.

9. Bureau of the Census, We the American Women, (1973), p. 8.

10. Economic Report of the President (1974), p. 156.

11. See statistics and examples in Murphy, Female Wage Discrimination: A Study of the Equal Pay Act 1963–1970, 39 U.Cin.L. Rev. 615, 616–618 (1970).

ately and directly as possible. This opinion does not authorize discrimination against men in any other context. It certainly is not based on any notion that because men and women are different, they can be treated differently.

The motion to dismiss is granted.

McMILLEN, District Judge (dissenting).

This cause is before the court on the government's motion to dismiss the complaint. Hence the factual allegations of the complaint are taken as true, and the plaintiff is entitled to an opportunity to prove any set of facts which support the substance of his complaint. Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The majority opinion is based upon certain assumptions which may or may not prove to be well-founded. Therefore I would deny the government's motion to dismiss which was filed on November 12, 1973 and grant the plaintiff an opportunity to proceed with further discovery on the government's motion for summary judgment which was filed subsequent to its motion to dismiss.

The gist of the complaint is that female retirees receive more liberal benefits than males who retire under exactly the same circumstances and that this violates the Fifth Amendment to the United States Constitution. The majority opinion assumes that the purpose of this differential in benefits is to compensate females for the lower wages which they had previously earned. There is no evidence in the record, however, that these conditions have existed or that they have existed in all levels or types of employment covered by the Social Security Act. Equally importantly, there is no evidence in the record that Congress adopted the distinction in order to compensate for past discrimination.

It is possible that the differential in benefits may have been adopted for reasons other than past discrimination, including the impermissible motive of "romantic paternalism". This latter rationale was apparently the basis of the Second Circuit Court's decision on this issue in Gruenwald v. Gardner, 390 F.2d 591 (2nd Cir. 1968). However, the Supreme Court in Frontiero v. Richardson, 411 U.S. 677 at 684, 93 S.Ct. 1764, 36 L. Ed.2d 583 (1973), has implicitly criticized this concept.

If the differential was not designed to remedy past discrimination, then it must rest on some different rationale than is contained in the majority opinion or it is arbitrary. The record is silent on what the rationale might be, and the plaintiff should be allowed to prove the absence of a rational relationship between the discrepancy in rates and a legitimate governmental interest after this issue is joined on the pleadings.

The majority opinion also ignores the fact that old age benefits under Title II of the Act are paid from a trust fund which is supposedly maintained on an actuarial basis. Sec. 401 of Title 42, when originally enacted, appropriated an " 'amount sufficient as an annual premium' to provide for the required payments [under this title] . . . 'to be determined on a reserve basis in accordance with accepted actuarial principles, and based upon such tables of mortality as the Secretary of the Treasury shall from time to time adopt . . .' " See Helvering v. Davis, 301 U.S. 619 at 636, 57 S.Ct. 904, 906, 81 L. Ed. 1307 (1937). This means that beneficiaries who live to their life expectancy may expect to receive benefits directly related to the tax contributions which they and their employers have made, and that the shares of one group should not be decreased in order to provide compensation for alleged discrimination against another group. Before we decide that Congress has departed from the actuarial concept (although admittedly it has abandoned maintaining a funded trust), we should examine the legislative histo-

ry of this Act and particularly of Secs. 401 and 402. The difference in concept between old age benefits and payments to families with dependent children (AFDC) distinguishes this case from Ramirez v. Weinberger et al., 363 F. Supp. 105 (N.D.Ill.1973), as that court expressly recognized.

The majority further assumes that Congress has abandoned the different benefits between men and women as of 1975 because the effects of discrimination will have been dissipated by then. This involves a doubly unsupported assumption, first that wage discrimination generally occurred against women in employments covered by the Social Security Act and secondly that its effects will disappear in 1975. If this is found not to have occurred, will some court then find that Congress has invidiously discriminated against women by removing the differential in benefits before the reason for its existence has been removed? And if discrimination against women has been remedied, will a court hold that Congress can then use Social Security benefits to compensate such minority groups as blacks or convicted felons for the wage discriminations which they have presumably suffered? There is no end to the problems which can be foreseen if the complaint in this case is dismissed without further examination.

The Social Security fund is still defined as a trust in Sec. 401 of the statute. When a genuine issue is raised, the trust funds should not be diverted until the rights of all the beneficiaries have been zealously examined. Particularly in view of the admonition of at least 4 members of the Supreme Court in *Frontiero* that "classifications based upon [sex] are inherently suspect and must therefore be subjected to close judicial scrutiny" (411 U.S. at 682 and 688, 93 S.Ct. at 1768), I believe the motion to dismiss should be denied and the motion for summary judgment be allowed to proceed.